LEVERETT M. ANDERSON, APPELLANT, V. SOUTH OMAHA LAND COMPANY ET AL., APPELLEES.

[FILED DECEMBER 16, 1892.]

Trusts: SUFFICIENCY OF EVIDENCE TO ESTABLISH. Evidence *held* to be insufficient to establish a trust in favor of the plaintiff in the property in controversy.

APPEAL from the district court for Douglas county. Heard below before WAKELEY, J.

*B. F. Kauffman, Seevers & Seevers, A. S. Churchill,* and *Edson Rich,* for appellant.

53

*J. M. Woolworth, Gannon, Donovan & Shea,* and *Lee S. Estelle, contra.*

NORVAL, J.

This suit was instituted in the court below on the 10th day of November, 1888, by Leverett M. Anderson against the South Omaha Land Company, a corporation organized and existing under the laws of this state, and William A. Paxton, Peter E. Iler, James M. Woolworth, Alexander H. Swan, Thomas Swobe, Frank Murphy, and Charles W. Hamilton, alleging in his petition, in substance, that in or about the month of September, 1883, certain lands, described in the petition, situate in the counties of Douglas and Sarpy, were conveyed to the plaintiff and held by him in trust for certain parties who had contributed to the purchase price thereof, which amounted to the sum of $350,000, including certain improvements made upon said lands, and at the time contemplated; that plaintiff contributed $6,250 of said sum of $350,000, and by reason thereof was the owner of one fifty-sixth portion of all of said property; that all the persons named as individual defendants, together with a large number of other parties, contributed to said sum of $350,000 and were interested in said property, but that the exact amount so contributed by them is unknown to the plaintiff; that all the defendants knew that plaintiff was one of the contributors to said sum and owner of a portion of the property; that on or about the 1st day of January, 1884, at the request of the beneficiaries in said property, plaintiff and his wife, Ella S. Anderson, conveyed to the individual defendants, as trustees for the use and benefit of all the parties beneficially interested, all of said real estate, together with all structures, erections, improvements, ways, and rights of way, tracks, bridges, viaducts, culverts, fences, warehouses, shops, dwelling houses, superstructures, and fixtures upon said lands, as well those which should

thereafter be acquired as those which have been acquired for the use of said trust estate, or in connection therewith, or which may be incident to said trust; that by the terms of said trust deed it was provided for the issue of three series of bonds in said deed described and secured thereby, and by said instrument said trustees were given certain and definite powers with respect to said trust property, as well as certain powers relative to the issuing of the several series of bonds in said deed of trust mentioned, which are set forth in a copy of the deed made in that behalf, annexed to and made a part of the petition; that by the terms of said deed, the said trustees were to issue of the first series of bonds five hundred of the face value of $1,000 each, a second series of four hundred and fifty bonds of $1,000 each, and a third series of a like number and denomination as the second series; that the defendants named in said conveyance as trustees accepted the trust and undertook the execution thereof, and that by virtue of the premises plaintiff was entitled to one fifty-sixth of the bonds to be issued under the provisions of said trust deed; that only the first series of bonds were ever issued, and for the second and third series certificates were issued in lieu of said bonds, stating that the holder of said certificates was entitled to the bonds, of the second series as shown by said certificates.

It is further alleged that by the terms of said trust deed certain of the lands therein described were to be sold to the Union Stock Yards Company of Omaha; that said trustees have sold and conveyed a portion of said lands to said Stock Yards Company, and received in payment thereof the sum of $78,250; that said trust deed provided for the laying out and platting into lots and blocks certain other of said lands, and for the manner and method of making sales of such lots; that by the terms of said trust deed the said trustees were required from time to time to take, and preserve in writing, evidence as to the value of the trust

estate, and to appraise the value thereof, and were prohibited from making sale at a less price than was so ascertained.

It is further alleged that on or about the 23d day of July, 1886, the said trustees, in violation of their said trust, made a pretended sale of all of said trust property, funds, and assets to one John H. Bosler, for the pretended sum of $750,000, and said trustees ultimately conveyed to him all of said property; that certain of the trustees and other parties were interested with Bosler in said purchase, who afterwards, together with certain of said trustees, organized the South Omaha Land Company for the purpose of receiving the conveyance of said real estate and trust property, and holding the same for the use and benefit of the parties so claiming to purchase said trust property; that Bosler conveyed all of said property to said corporation, and it received such conveyance with full knowledge of all the facts stated in the petition; that the trustees concealed from plaintiff the fact that they were interested in the purchase of the property; that plaintiff has never received any part of said trust property, or any portion of the first issue of bonds, or any benefit arising therefrom, nor any certificate showing him to be entitled to his due and legal portion of the second and third series of bonds, when the same should be issued; that all of said trustees knew that plaintiff had furnished the money, as above stated, to purchase said lands, and create said trust property and funds, and also of his interests in and right to his proportion of said bonds and certificates aforesaid and that he had never received the bonds and certificates representing his interests; that of the said fund of $350,000 there were $22,951.72 turned over to the trustees mentioned in said trust deed and formed a part of the trust estate.

It is further alleged that said trustees sold said property for a grossly inadequate price and far below the appraised

value thereof; that, in order to procure all of the said trustees to sign the conveyance to said Bosler, there were paid to certain of said trustees large sums of money, in addition to the distributive shares of such trustees, who were also personally interested in said property, as a bonus to secure the relinquishment of their own personal interest therein and to induce them to sign said conveyance; that the money thus paid as a bonus was taken out of the trust property; that such of the trustees as were not paid a bonus were interested with Bosler in said purchase, assisted in the organization of the defendant corporation, and are officers in said company.

The petition further charges that a large portion of said trust funds has been misappropriated by said trustees, and devoted to the payment of attorney fees in certain litigation brought about by the refusal of certain of the trustees to sign the deed of conveyance to said Bosler, and in payment of moneys to said certain trustees to induce them to sign such deed, and in other illegal and unwarranted expenditures; that since said pretended sale to Bosler, and the conveyance by him to the defendant company, large sales of said lands have been made, and there is now a large amount of money, notes, contracts, bills receivable, and other assets in the hands of said company; that a large portion of said lands has not been sold, in all of which funds, assets, property, money, and lands plaintiff is interested; that said funds, bills receivable, assets, and unsold property are of the value of $5,000,000; that said trustees have wholly renounced and repudiated said trust relation to said property, and refuse to further act under said deed of trust, but insist that the sale is valid, and that the defendant corporation claims to be the owner of all of said trust property.

The prayer is, that the sale and conveyance of said property to Bosler, and by him to the South Omaha Land Company, be set aside, as fraudulent and void; that plaintiff's

interest in the trust property be ascertained, declared, and established; that the trustees be required to account for all moneys, property, bills receivable, and assets which have come to their hands, and the said company be likewise required to account; that plaintiff be decreed his full right and interest therein; that a receiver be appointed, and for such other or further relief as plaintiff is in equity entitled.

The defendants Swan, Swobe, Murphy, and Hamilton did not answer. The other defendants filed a joint answer, which is too lengthy to give the substance thereof here. For the purpose of our investigation it is sufficient to say that the answering defendants deny that plaintiff was one of the contributors to the purchase price of the lands in controversy, or ever had any interest in the property, and also many other allegations of the petition are denied. The defendants set up some new matters of defense which are controverted by plaintiff in his reply.

Upon the trial the district court found the issues in favor of the defendants, and dismissed the bill. Plaintiff appeals.

It is disclosed by the record that plaintiff has been a resident of Omaha since 1866, a portion of which time he was a conductor on the Union Pacific railroad; that the defendant Swan has been for many years a resident of Wyoming and engaged in the cattle business; that Anderson and Swan have been for years intimately acquainted, besides being distantly related by marriage; that in the latter part of 1882 Swan was in Omaha, and had some talk with Anderson on the subject of buying lands and building stock yards where South Omaha now stands, but no definite plan for the proposed enterprise was then formulated. In January following Swan went to Europe, and while on his way east, wrote and sent to Anderson the following letter:

"New York Central, Jan. 15, 1883.

"L. M. Anderson, Omaha: I had a long talk with Kimball, and very satisfactory. He gave me full history

of all troubles and differences. I am not at liberty to give details now, as he requested strict confidence; but I may say this to you, that he will favor me in any and every way possible in the carrying out of a scheme on the Omaha side with yards, slaughter houses, canning houses, and all other things that may follow—making the enterprise a big and successful scheme. He's all right; and if he holds his power in the road, I am solid for knocking down the whole outfit. I explained to him my plans, and he told me to make every endeavor to carry them out and he would see me through. You will understand the enterprise has attractions for him. Don't say anything more to Schaller, only to say that you can't tell anything about it until I get back. That ground and yards will not do; but you may take them down and use elsewhere. The ground at the Summit, about a mile beyond, where the drainage goes the other way from town, is now our idea. He will run the dummy right out regular trips, whenever the business is opened. The idea is to buy from one to two hundred acres at the Summit, and start yards, canning house, and all at once. He, Kimball, knew how I was pushed out of the other side, and he knows that J. T. was with Paxton. That was not entirely new to me; for I had a hint of it before. This is a brief outline of what will come if nothing happens to interfere. I will take in one or two moneyed parties, perhaps Scotch, have not yet determined who; but I will not again lose control and get Kimball out. This must be treated entirely confidential, as any leakage of plans would defeat all. No more will be made until I return. We sail 17th on 'Pavonia, Cunard Line.' My address, 23 Mayfield Garden, care James Wilson.

"A. H. SWAN."

In the month of April, 1883, Mr. Swan returned from his European trip, and soon thereafter he determined to go ahead with the stock yards scheme already alluded to, and to that end he made arrangements with Anderson, by which

the latter was to contract for the lands in controversy. One C. R. Schaller was likewise employed to negotiate for the lands. In pursuance of said arrangement, Schaller, during the months of May, June, July, and August, 1883, purchased under contracts over 1,800 acres of land, at a cost of $327.048.43, taking the contracts therefor in his own name. A portion of the purchase price was paid down, while on the remainder time was given. On the 6th day of June, 1883, after two purchases had been made, Schaller and Anderson entered into a writing, stating that the purchases, payments, and contracts were made by Schaller for Anderson, and the former, by said instrument, also assigned all interest in said contracts to the latter. The contracts taken by Schaller subsequent to the date last above were duly assigned to Anderson on the 12th day of January, 1884. Prior to the 30th day of August, 1883, there had been paid upon the lands something less than $40,000. The testimony shows that prior to said date Mr. Swan solicited certain capitalists of Omaha to assist in the enterprise. Finally a meeting of the persons thus solicited was held on said date at the Millard Hotel, which resulted in the formation of the South Omaha Land Syndicate, of which Swan was made president and financial agent. A secretary and a treasurer were chosen. The syndicate raised, including the amount which had previously been paid on the contracts, the sum of $350,000. The balance of the purchase money due upon the lands was paid, which left in the treasury $22,951.57. Upon full payment being made on the contracts of purchase, the lands were conveyed by the owners to Anderson, who held the title in trust for the use and benefit of all the parties beneficially interested therein. Subsequently, at the request of the syndicate, Anderson and wife, by deed of trust, conveyed the property to Alexander H. Swan, Frank Murphy, Thomas Swobe, Charles W. Hamilton, William A. Paxton, Peter E. Iler, and James M. Woolworth, as trustees, they having been chosen by the

syndicate for that purpose.   The terms of the trust upon which they took the title are set forth at great length in said instrument.   The deed of trust recites, in substance, that said trustees have made their fourteen hundred several coupon bonds of·$1,000 each of even date with said instrument, payable to the order of L. M. Anderson, the bonds being divided into three series as follows: 500 of the first series and the second and third series to the number of 450 each.   The form of the bonds and coupons of each series is set out in said instrument.   Then the said deed of trust declares in brief, among other things, that the said trustees shall sell and convey a certain portion of the premises therein mentioned to the Union Stock Yards Company, of Omaha, at and for such sum of money as may be agreed upon by and between them and the said company, subject to certain conditions as to improvements to be made upon said real estate by said Stock Yards Company; that the trustees shall lay out the remainder of the lands conveyed to them, or so much and such parts thereof as they in their discretion may deem expedient, into a town, with streets, passage ways, and public grounds, and improve the same; that the lands shall be carefully valued and appraised by said trustees, and they were authorized to sell any parcel or parcels of said lands at not less than the appraised value thereof; that all moneys arising from such sales, after deducting the expenses of executing the trust, be held by said trustees for the security of the said bonds and coupons, and all such moneys be applied, first, to the payment of the bonds and coupons of the first series, and then to the payment of those of the second and third series, in the order named; that in case of any default in the payment of any interest or principal of any of said bonds for the period of six months, the holders of said bond so due and unpaid were empowered to enforce their rights by legal proceedings.

It is further provided in article eleventh of said trust deed that " If, after the payment of all the bonds secured

by this indenture, or any of the said trust estates, rights, interests, or property of whatever nature hereinbefore mentioned, or arising out of the same, or the proceeds thereof, shall remain in the hands of said trustees undisposed of, and subject to be disposed of by them for the holders of the bonds of the third series, the said bondholders shall be, and shall be taken to be, entitled to. the whole beneficiary right and interest therein, and in respect thereof; and the said trustees shall hold the said estate, rights, interests, and property for and in trust for them, and shall dispose of the same, either by distribution, division, or partition, among the said bondholders, or by sale and a distribution among the said bondholders of the proceeds arising therefrom according to their respective interests; and in such case of the final determination and settlement of their said trust, the said trustees shall respect the directions in writing of a majority of said bondholders, except as to the proportions of the interests of the several bondholders in the residue of the said trust estate."

It further appears from the evidence that bonds of the first series were issued by the trustees in accordance with the stipulations contained in said deed of trust; while the second and third series of bonds provided for in said instrument were never issued, but in lieu thereof certificates were given, certifying that the holder of the same was entitled to the number of bonds of the said second and third series stated therein, when the same should be issued. Subsequently all the bonds of the first series and the said certificates calling for bonds of the other series were distributed among the members of the South Omaha Land Syndicate, according to their respective subscriptions to the enterprise. At a meeting of the said trustees held on the 7th day of May, 1886, Mr. Swan, as president and financial agent of the syndicate, was directed to sell all the lands, bills receivable, cash, and assets belonging to the same for $750,000, provided he effected such sale by the

1st day of August following. At a meeting of the trustees on July 24, 1886, Mr. Swan reported that he had entered into a contract for the sale of all of the trust estates to John H. Bosler for $750,000; the sale was ratified and confirmed by a majority of the trustees, although three of them, Swobe, Murphy, and Hamilton, disapproved of the sale and refused to join with their associates in executing a deed of conveyance to Bosler. Thereupon Bosler brought suit in the circuit court of the United States for the district of Nebraska against all the trustees for the specific execution of the contract of sale, and Herman Kountz was appointed receiver by said court, to take charge of the trust properties. On the first day of January, 1887, said court rendered a decree in favor of the plaintiff in said action, and ordered the trustees to execute a conveyance to said Bosler, and on the 31st day of the same month the trustees executed their deed conveying to him the lands in controversy, as well as all the rights, debts, choses in action, moneys and interest of every kind and nature connected with and incident to the lands described in said trust deed. On the 3d day of January, 1887, the South Omaha Land Company was incorporated by John A. McShane, W. A. Paxton, J. H. Bosler, P. E. Iler, and J. A. Creighton, and by the articles of incorporation certain of the said trustees of the South Omaha Land Syndicate, with others, were appointed directors of the Land Company. On the 19th day of February, 1887, all the properties covered by the deed to Bosler were conveyed by him to the South Omaha Land Company.

It is an admitted fact that during the pendency of the suit already mentioned, and prior to the final determination thereof, a bonus amounting to several thousand dollars above their proportion or share of the $750,000 was paid by Bosler to the three trustees who resisted the sale made to him by Swan, and thereafter such trustees made no further resistance to the carrying out of said sale, or to the said suit

in the federal court. There is likewise to be found in the record some testimony tending to prove that certain of the remaining trustees were interested with Bosler as purchasers of the trust properties.

. Counsel for appellant contend that Anderson contributed and paid out of his own moneys toward the original purchase of the real estate involved in this lawsuit, prior to the formation of the South Omaha Land Syndicate, $10,-576.15, for which he has never been reimbursed, and that by reason thereof he is entitled to one fifty-sixth interest in all of said lands. Appellees, on the other hand, insist that Anderson never invested a dollar of his own funds in the enterprise. The most important, as well as the most difficult question presented by the record for our consideration is purely one of fact, namely: Did appellant ever advance the sum claimed by him, or any other amount, towards the purchase of these lands? If he did not, then it is clear his suit must fail, for he bases his right to have a trust declared in his favor upon the ground that he was one of the contributors to the purchase price.

There is no dispute but that nearly $40,000 had been paid on the contracts of purchase prior to August 30, 1883, the day on which the meeting was held at the Millard Hotel for the purpose of inducing certain Omaha parties to join Swan in his scheme for the purchasing of said lands and laying out a town. Of the said sum it is conceded that Mr. Swan furnished to Anderson $15,808.57 on August 24, 1883, and the further sum of $13,684 on the following day, which amounts were deposited by the latter in the Omaha National Bank to his own credit, and were paid by him on the contracts of purchase by checks drawn upon said bank. In fact all payments, both prior and subsequent to the organization of the syndicate, were made through Anderson. Plaintiff claims, and he so testified at the trial, that of the said sum of $40,000 he contributed of his own funds the following amounts: May

30, 1883, $1,900; June 4, 1883, $579.90; June 11, 1883, $1,020.20; June 23, 1883, $1,000; June 25, 1883, $3,000; June 27, 1883, $2,000; August 15, 1883, $750; that the foregoing sums were paid by his personal checks drawn for the several amounts upon the Omaha National Bank, payable to the order of C. R. Schaller, the person in whose name the contracts of purchase were taken. Checks for the said sums indorsed by Schaller, and stamped paid by the bank, were introduced in evidence, and copies thereof appear in the record. Plaintiff also testified to having paid of his own means several sums after the date of the meeting at the Millard Hotel, already alluded to, enough to swell the total amount alleged to have been contributed by him to $10,576.15.

Mr. A. H. Swan testified on behalf of plaintiff to the effect that Anderson furnished of his own means to put into the purchase of these lands something in excess of $10,000; and that at certain meetings of the trustees he stated to them that Anderson was interested in the said purchase.

If the foregoing was all the testimony to be found in the record relating to the furnishing of money by Anderson, the question would be an easy one to solve. There are, however, other facts and circumstances disclosed by the testimony, some of which will be now mentioned, which appellees insist established that Anderson is not now, nor ever was, financially interested in the said trust properties, but that the payments made by him were made with Swan's money, and solely for the benefit of the latter. It is uncontradicted that prior to the land transaction in question plaintiff had been interested in business with Mr. Swan at different places; and that from January, 1883, until September of the same year the latter was engaged in feeding cattle, and, when fat, shipping them to eastern markets for sale. Proceeds derived from the sale of stock were placed to Anderson's credit in the Omaha National Bank, and were carried into the same account as funds deposited

which belonged to him individually; that plaintiff, during
the same period, paid out for Swan, by checks upon said
bank, large sums of money on account of the cattle busi-
ness. The account of Anderson's with said bank was in-
troduced in evidence and is included in the bill of excep-
tions, from which it appears that on the 30th day of May,
1883, the day on which the $1,900 check already referred
to was drawn to make the first payment on the lands, his
bank account was overdrawn to the amount of $758.46,
excluding the amount called for in said check; and on the
11th day of June, 1883, when the check for $1,020.29 was
issued to make the third payment, Anderson's bank ac-
count showed a balance against him of $7.926.95, not in-
cluding the amount of the check. · Between May 30th and
June 12th but three deposits were made to his credit in
the bank, aggregating $6.022.21, and between the same
dates he drew out of the bank, on account of the cattle busi-
ness, $10,351.86, besides $579.71 to make the second pay-
ment on these lands, and also two other sums aggregating
$285.60, but for what purpose used the evidence fails to
show. An examination of the subsequent items of the ac-
count, in connection with the evidence of Mr. Wallace,
the bank cashier, shows that the above balance standing
against Anderson on the bank books, on June 11, 1883,
as well as all checks drawn after that date by Ander-
son to make payments on the lands, were subsequently
met by deposits of moneys belonging to Swan. On
June 14th a deposit of $14,862.50 was made to An-
derson's credit, which amount was the proceeds of a
note for $15,000, signed by Swan Bros. & Co., and
L. M. Anderson, due in thirty days... It is conceded
by appellant that the money derived from the discount of
the note was not his own, but belonged to Mr. Swan.
After the last mentioned date, and prior to August 1st,
Anderson has credit on his account with seven items, aggre-
gating over $70,000, derived from the sale of cattle, and

his account only shows three items to his credit after June 11th, which the evidence does not establish, came from the same source.   One on July 3d, $408.58 ; one on July 17th, $255.88, and another on July 24th, $230.20.   Considering these facts in connection with appellant's inability on cross-examination, when requested so to do, to tell where he obtained the money he advanced on the lands, and the further fact that several of the trustees testified that no statements were ever made in their presence by Mr. Swan, or any one else, about Anderson being financially interested in the venture, but that at the meeting of August 30, 1883, which was attended by plaintiff, Mr. Swan did state that he had furnished the money to Anderson that had been paid on the lands, we are not willing to say that the trial court was not warranted in inferring that the amounts advanced by Anderson, although from funds deposited to his credit, were made with moneys belonging to Mr. Swan, and on his behalf.

Now, while the evidence does not make plain of whose funds some of the deposits in the bank to Anderson's credit were made, nor on whose account several of the items of disbursements were made, yet we think, inasmuch as the account was overdrawn several hundred dollars when the check for $1,900 was drawn, and that the aggregate of all deposits made subsequently thereto, not established by the proofs to have come from the cattle business, was wholly inadequate to cover the sums claimed to have been advanced by plaintiff on account of the lands in dispute, Anderson was called upon to show, if such was the fact, that the overdraft at the bank was occasioned by disbursement relating to the feeding of cattle, and not on his individual affairs.   In other words, that at the date of the overdraft appellant had drawn out of the bank of his individual funds, for Mr. Swan's benefit, and for which he had not been reimbursed, an amount sufficient, with his own means thereafter deposited, to cover all the checks given by him

as payment on the lands. His failure to do so is a strong circumstance against his contention here made. We cannot assume, as counsel ask us to do, that certain items on the debit side of this account prior to May 30, 1883, related to the cattle business. There is certainly no presumption that they were not paid for Anderson's own benefit.

It is argued that even if Anderson used funds belonging to Mr. Swan to purchase these lands, the former became thereby indebted to the latter for the amount thus used, and Anderson acquired an interest in the trust property. This view might be taken, were it not for other facts appearing in the record, already alluded to, and others hereafter stated, which tend to show that Anderson did not regard the transaction at that time in that light.

Other matters are disclosed by the record which doubtless helped turn the scales against the plaintiff in the lower court. Some of these will be briefly stated. He only claims in his petition, and in his evidence, that he is entitled to one fifty-sixth interest in the trust property, by reason of his having contributed $6,250 of the sum of $350,000. He explains it in his testimony thus: That after the making of the trust deed he had an understanding with Mr. Swan, the financial agent and president of the syndicate, to the effect that he was to retain an interest to the extent only of $6,250 in the property, and was to be reimbursed by the trustees the difference between that sum and $10,576.15, the amount alleged to have been advanced by him from his own means. It is not contended that prior to the instituting of this action Anderson ever made any claim to the trustees for reimbursement of the excess of $6,250, although there remained in their hands of the fund of $350,000, after paying for the lands, and all expenses connected therewith, $22,951.17. He was in the employ of the trustees at a stated salary during the major portion of the time they held title to the property and was

paid for his services from time to time, but made no claim that anything was due him on account of moneys advanced. He knew of the pendency of the suit against the trustees in the federal court, of the appointment of the receiver, of the conveyance of all the trust properties to Bosler, and by him to the South Omaha Land Company, and was employed by the receiver to look after the lands while they were under his care, and occupied the same position under the land company, yet he failed to assert any interest in the trust estate, and made no claim to the trustees for moneys paid out by him, until long after the sale of the land to the defendant corporation. It would seem reasonable, under the circumstances stated, if he had any rights or interest in these lands, or if anything was coming to him on account of their purchase, he would have asserted the same earlier than he did.

It appears that at the preliminary meeting held at the Millard Hotel on August 30, 1883, for the purpose of raising money with which to pay for the lands, it was determined that certificates should be issued to the subscribers to the purchase price upon the payment of their subscriptions, which certificates were to be converted into bonds thereafter to be issued by the trustees. A subscription for the bonds was started, by the terms of which each subscriber was to pay twenty-five per cent of the face value of the bonds by him subscribed for. Subscriptions were made for 1,400 bonds, aggregating $1,400,000, being the exact number of bonds and the amount secured by the trust deed. There is evidence tending to show that Anderson was present at the meeting at which the subscription paper was drawn up and signed, yet his name nowhere appears on the list. The subscriptions were afterwards paid, thereby raising the fund of $350,000, which is conceded to be the amount that went into the venture. True Anderson swears that he never heard of the subscription paper, but the preponderance of the testimony is against

54

him.   If he knew of it, as we think he must, a pertinent
·inquiry is, why did he not sign for the amount claimed to
have been advanced by him, as did Swan?   Every one,
unless it be Anderson, who contributed to the project,
signed the subscription paper.   He admits he was present
when the bonds were being signed, and they were distrib-
uted among the persons signing the subscription paper, ac-
cording to the amount subscribed by each.   From which,
as well as from the recitals in the deed of trust signed by
himself, Anderson was apprised of the fact that the bonds
were ˙about to be issued.   He afterwards knew of their
issue, for he purchased and ˙held two of them.   He also
knew that the bondholders were the beneficiaries under the
˙trust deed, and that by the eleventh ˙article thereof, ˙if, af-
ter the payment of the bonds secured thereby, any portion
of the trust estate remained undisposed of, it was to be dis-
tributed among the bondholders of the third series; yet he
·made no claim to any portion of the bonds.   Such conduct
is convincing proof that he did not then consider he had
any interest in these lands.

    There is nothing in the letter written by Swan to An-
derson, a copy of which is given above, which can be con-
strued as conveying the idea that appellant was to become
interested with Swan in the venture, but on the contrary
the whole tenor of the language used therein tends to show
that Swan had no such intention.   He writes: "I will
take in one or two moneyed parties, perhaps Scotch; have
not yet determined who."   There is nothing significant in
the fact that Swan wrote Anderson about the proposed
scheme, or that the deeds to the lands were taken in the
name of the latter, since the two were connected by mar-
riage, had been associated together in·business, and at the
time Anderson was receiving the moneys belonging to
Swan arising from the sale of cattle, and was disbursing
the same.   The confidence reposed in plaintiff by allowing
the title to the property to be taken in his name, under the

circumstances, is perfectly reasonable and natural and entirely consistent with the theory that plaintiff was not financially interested in the lands.    Our conclusion is that the evidence is not sufficient to establish a trust in favor of the plaintiff.

It is argued by counsel for appellant that the transfers of the property to Bosler and by him to the South Omaha Land Company were void, for the reason that a portion of the defendant trustees were interested therein as purchasers, and others of them were paid a bonus by Bosler to prevent their resisting the transfer.    While the law forbids one who holds property in trust from becoming a purchaser thereof from himself, either directly or indirectly, plaintiff is not in a position to invoke the rule in this case, inasmuch as he had no interest in the property.    Only those beneficially interested in the trust estate could question the transfers on the ground urged.    For the reasons stated the judgment below is

AFFIRMED.

THE other judges concur.